**FILED**

**OCTOBER 19, 2010**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRIANNA GREENE, on behalf of herself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 10-cv-117 |
| v. | ) ) | Judge Charles P. Kocoras |
| DIRECTV, INC., FIRST CONTACT, INC,. and iQOR HOLDING US INC., | ) ) ) ) | Magistrate Judge Cox |
| Defendants. | ) | |

**PLAINTIFF'S OPPOSITION TO BOTH DEFENDANTS'**

**<u>MOTIONS FOR SUMMARY JUDGMENT</u>**

**BURKE LAW OFFICES, LLC**

155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................i

TABLE OF AUTHORITIES .............................................................................ii

I.  **Facts** ............................................................................................ 1

    a.  DirecTV Ignores All Warning Signs of Identity Theft,
       Including Plaintiff's Fraud Alerts. ................................................ 2

    b.  iQor Calls Plaintiff Using Proscribed
       Equipment that Does Not Work. ................................................... 4

II.  **Summary Judgment Standard.** ................................................... 5

III.  **The Fair and Accurate Credit Transactions Act and Fraud Alerts** ............................ 6

    a.  DirecTV Received Plaintiff's Extended Fraud Alert. .................................... 7

       i.  Whether Plaintiff Submitted an Identity
         Theft Report is Irrelevant to this Case ............................................. 7

       ii.  Plaintiff Submitted an Identity Theft Report.................................... 7

    b.  There is no Reuqirement in Section 1681c-1 that
       a Fraudulent Account in Plaintiff's "Name" as Defendants Urge. .............. 9

IV.  **Defendants Violated the TCPA.** ................................................ 12

    a.  The 2008 FCC Order Does Not Broaden
       "Prior Express Consent" in this Circumstance. ......................................... 13

    b.  Even if Providing her Cell Phone Number to DirecTV
       constituted "Prior Express Consent," to receive
       Autodialed and Prerecorded Message calls, any
       consent expired when DirecTV opened an
       account associated with plaintiff. ............................................................ 13

    c.  Alternatively, if DirecTV had no Duty to Call Plaintiff,
       then there was no Privilege to call plaintiff, either. ................................. 21

CONCLUSION ............................................................................................ 22

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................................... 5

*Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232 (7th Cir.1991) .......................................... 6

*Bizier v. Globe Fin. Serv., Inc.*, 654 F.2d 1 (1st Cir.1981), ................................................. 11

*Brothers v. First Leasing*, 724 F.2d 789 (9th Cir.1984). ................................................... 11

*CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443 (7th Cir. 2010) .............. 14, 19

*Conley v. TRW Credit Data*, 381 F.Supp 473 (N.D.Ill. 1974) .............................................. 11

*Connecticut National Bank v. Germain*, 503 U.S. 249 (1992) ............................................ 15

*Edeh v. Midland Credit Management, Inc.*,
2010 U.S. Dist. LEXIS 103888 (D. Minn. Sept. 29, 2010). ................................................. 19

*Haque v. CompUSA*, 2003 WL 117986 (D.Mass. Jan 13, 2003) ......................................... 12

*Hicks v. Client Services, Inc.*, 2009 WL 2365637 (S.D.Fla. June 9, 2009) .......................... 13

*Joffe v. Acacia Mortg. Corp.*, 211 Ariz. 325 (Ariz. Ct. App. 2005).  ................................... 17

*Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37 (D.C.Cir. 1984) ......................................... 11

*Leckler v. CashCall*, 554 F.Supp.2d 1025 (S.D.Cal. 2008),
vacated upon reconsideration based upon inapplicable
grounds, 2008 WL 5000528 (Nov. 21, 2008) .............................................14, 15, 16, 18, 19

*New Jersey v. New York*, 523 U.S. 767 (1998) ................................................................... 14

*Oppenheimer v. Guzco Guarantee*, 977 F.Supp. 549 (D.P.R. 1997) ................................... 12

*Perry v. First Nat. Bank*, 459 F.3d 816 (7th Cir. 2006) ...................................................... 11

*Pugliese v. Prof. Recovery Serv., Inc.*, 2010 WL 2632562 (E.D.Mich. June 29, 2010 ) ...... 19

*Satterfield v. Simon & Schuster*, 569 F.3d 946 (9th Cir. 2009) ...............................12, 13, 17

*Satterfield v. Simon & Schuster*, 2007 WL 1839807 (N.D.Cal. Jun. 26, 2007) .................... 17

*Sengenberger v. CCS, Inc.*, 2010 WL 1791270 (N.D.Ill. May 5, 2010) ............................... 14

*Soghomonian v. U.S.*, 278 F.Supp. 2d 1151 (E.D.Cal. 2003),............................................. 12

*Starkey v. Firstsource,* 2010 WL 2541756 (W.D.N.Y. Mar. 10, 2010) ............................... 19

*Williams v. Equifax Credit Info. Servs.*, 892 F.Supp. 951 (E.D. Mich. 1995) ............... 12, 17

### STATUTES and REGULATIONS

15 U.S.C. § 1681a(q)(3) ...................................................................................................... 9

15 U.S.C. § 1681c-1 ................................................................................................... *passim*

28 U.S.C. § 2342 ................................................................................................ 18

47 U.S.C. §227(b) ......................................................................................... *passim*

16 C.F.R. §603.2 ..............................................................................................8, 9

47 C.F.R. § 64.1200 ............................................................................................ 13

*In re Rules and Regulations Implementing the TCPA*, FCC 07-232,
23 FCC Rec. 559, at ¶10 (Jan. 4, 2008)....................................................... 13, 14

720 ILCS 5/26-1 .................................................................................................. 8

## OTHER AUTHORITIES

S.Rep. No. 102-178, at 1 (1991) as reprinted in 1991 U.S.C.C.A.N. 1968 ........................ 12

2004 U.S.C.C.A.N. 1753, H.R. CONF. REP. 108-396,
H.R. Conf. Rep. No. 396, 108th Cong., 1ST Sess. 2003,
available at 2003 WL 22761472 (Nov. 21, 2003) ............................................6, 9

Statement of Chi Chi Wu of the National Consumer Law Center
at the House Committee on Financial Services,
(June 19, 2007), available at 2007 WL 1750167. ............................................. 6

Merriam-Webster's Collegiate Dictionary, 11th edition (2003) ............................ 10, 16-17

Black's Law Dictionary, 8th edition (2004) ..................................................... 10, 15-16, 17

Concise Oxford English Dictionary, 11th edition (2008) ................................................... 17

In order to help prevent identity theft, the Fair and Accurate Credit Transactions Act (FACTA) amendment to the Fair Credit Reporting Act, 15 U.S.C. §1681c-1(h), requires that users of credit reports that receive notice of "extended fraud alerts" along with a credit check call the phone number provided along with the fraud alert before opening an account.

DirecTV disregarded three extended fraud alerts that instructed it to call plaintiff, and opened a satellite television account pursuant to applications that used plaintiff's social security number. DirecTV's policy is to open accounts first, in spite of fraud alerts, and then to call to check to see if they are fraudulent after the fact. DirecTV hired defendant iQor to use an autodialer with a broken prerecorded message contact plaintiff a week after DirecTV had opened the fraudulent account, and three days *after* it had installed satellite television service in the fraudster's Milwaukee home.

Thus, DirecTV violated the FCRA in failing to call the phone number in the fraud alerts it received. And both DirecTV and iQor violated the Telephone Consumer Protection Act in making the belated telephone call to plaintiff's cellular phone using proscribed equipment.

## I.  **Facts**

Plaintiff Brianna Greene is the victim of identity theft and a mixed credit file. PUMF 1. She was beginning the process of exploring the possibility of buying a condominium on January 30, 2008, when she became aware that there were several delinquent accounts on her credit report that did not belong to her. PUMF 1. Plaintiff now knows that another person named Larquette Green had opened several credit accountsusing Larquette's name and plaintiff's social security number. PUMF 2. Plaintiff did not know that Larquette Green existed before she began investigating the incorrect items on her January 30, 2008, credit report. PUMF 3.

1

On about October 7, 2008, after several attempts to fix the credit report problems, plaintiff requested that an extended fraud alert be placed on her Equifax credit file. PUMF 4. Plaintiff requested this because she thought it would be a way to curb and control the opening of accounts using her social security number. PUMF 5. A representative of Equifax told plaintiff on the phone that she placed an extended fraud alert on her credit file that day. PUMF 6.

Plaintiff believed her when the Equifax representative told plaintiff that she had to pay for the extended fraud alert, and plaintiff did, in fact, pay Equifax that day with her credit card. PUMF 7. While it may be possible that the Equifax person lied to plaintiff about having to pay for an extended fraud alert, plaintiff never doubted that her request was effective. PUMF 7.

Plaintiff initiated an extended fraud alert on her credit file with Equifax on or about October 7, 2008. PUMF 8. Plaintiff mailed Equifax a copy of the police report she made on October 10, 2008, three days after her telephone call requesting the extended fraud alert. PUMF 9. Because of these fraudulent accounts, including the DirecTV account challenged in this case, plaintiff's life has been very difficult. PUMF 10. Plaintiff has been frustrated and exasperated that credit was opened in the same manner as before, despite placement of multiple fraud alerts, including the extended fraud alert on October 7, 2008. PUMF 10. Plaintiff feels like both DirecTV and Larquette Green invaded her privacy by permitting credit to be opened using her social security number without first calling her. PUMF 10.

### a. DirecTV Ignores All Warning Signs of Identity Theft, Including Plaintiff's Fraud Alerts.

Larquette Green began investigating the possibility of opening a DirecTV satellite television account because she spent substantial time of on DirecTV's website in the days before her application was accepted by DirecTV. PUMF 11. During those website visits,

Larquette provided a social security numbers that were not her own. PUMF 13-14. DirecTV made six requests to Equifax for Larquette Green's credit report, and received three responses. PUMF 12.

The first request made by DirecTV was made on December 21, 2009. PUMF 13. Larquette entered a social security number for this initial request that reversed the last two numbers of plaintiff's social security number. PUMF 13. In response to a request by DirecTV, Equifax provided plaintiff's phone number, credit score and Chicago address in response to the request. PUMF 13, 15. The response also included an Extended Fraud Alert. PUMF 15-16. DirecTV did not investigate the extended fraud alert it received in association with this credit check. PUMF 17.

The second and third applications submitted by Larquette on December 23, 2009, "fixed" the social security number so that it matched plaintiff's. PUMF 14. In response to these credit report requests, DirecTV received from Equifax plaintiff's telephone number and address that differed from those on the application, and again received the extended fraud alert, but did not attempt to investigate or call plaintiff. PUMF 15-16. The fourth, fifth and sixth requests by Larquette resulted in the same thing: three more fraud alerts, and three more references to plaintiff's address and phone number. PUMF 14-16. The credit scores DirecTV received each time were those of plaintiff, and not Larquette Green. PUMF 18. DirecTV does not "verify" anyone's identity when it receives credit information from Equifax, even in cases where there is a fraud alert. PUMF 20.

In cases where there is a fraud alert or extended fraud alert, DirecTV does not have procedures in place to prevent identify theft or fraud before it happens. PUMF 34. When a fraud alert is returned in response to a credit request, the alert never even appears on an

3

agent's computer, and no investigation is done if a recipient of DirecTV's unmanned, autodialed, prerecorded fraud alert message does not affirmatively tell DirecTV that she "really meant" to place a fraud alert on her credit report. PUMF 19, 21. Of course, plaintiff had already notified DirecTV of potential fraud through her extended fraud alert, but apparently a fraud alert on a credit report is not sufficient evidence of potential fraud for DirecTV to halt its sales process in order to investigate. PUMF 23.

In addition to the fraud alerts, each time it accessed a credit report in association with Larquette Green, DirecTV received information that should have tipped DirecTV off that there was fraud. For example, the fraud alert phone number DirecTV received (plaintiff's cell phone number) did not match either of the two phone numbers Larquette Green provided DirecTV. Similarly, each response DirecTV received from Equifax included plaintiff's Chicago address. PUMF 12-16.

Despite these warnings, on December 28, 2009, DirecTV opened a satellite television account for Larquette Green. PUMF 24. DirecTV installed Satellite television services at Larquette's Milwaukee home on January 2, 2010, and took an automatic credit card payment for the debt on January 3, 2010. PUMF 24.

**b. iQor Calls Plaintiff Using Proscribed Equipment that Does Not Work.**

Three days later, on January 5, 2010, DirecTV had defendant iQor Holdings, Inc. ("iQor") call plaintiff on her cell phone using an automatic telephone dialing system and prerecorded voice message, in order to check to see if the account it had already opened was fraudulent. PUMF 25; IqorSMF 3.

When plaintiff received the call from iQor on her cell phone, she heard a message that told her an account had already been opened "in her name." PUMF 26. The call informs the

recipient on how he/she should take action to stop the fraud that has already occurred.   PUMF 28.  Plaintiff pressed "0" several times, as indicated in the message, but the system was not working properly, and nothing happened.  PUMF 27. After the call had disconnected, plaintiff called the Caller ID number for the previous incoming call on her cell phone and was connected with an iQor employee, who was serving as a representative of DireCTV.  PUMF 29.

 The representative asked plaintiff to provide her name, address and social security number, which plaintiff did, and the representative became quiet.   PUMF 30.   Plaintiff explained to the representative that another person had been opening credit in plaintiff's name over the previous couple of years, and the representative connected plaintiff with another person, who plaintiff remembers was a manager.  PUMF 30.

Plaintiff told the second person that plaintiff did not authorize the account, and again explained that Larquette had been doing this for a number of years.  PUMF 31.  The manager told plaintiff that DirecTV/iQor would send plaintiff an affidavit that plaintiff had to fill out, and that upon receipt of the affidavit, the account would be closed.   PUMF 31.   DirecTV disconnected Larquette's television service on  January 5, 2010.  PUMF 31.

DirecTV's internal fraud investigation does not begin until a person with a fraud alert on her credit report opts in to an investigation.  PUMF 31.  Of course, plaintiff had already notified DirecTV through her fraud alert, but apparently a fraud alert on a credit report is not sufficient evidence of potential fraud for DirecTV to halt the sales process and investigate.

## II.   **Summary Judgment Standard**

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The Court must draw all reasonable inferences in favor of the non-movant, but is "not required to draw every conceivable inference from the record --only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991).

### III.     **The Fair and Accurate Credit Transactions Act and Fraud Alerts**

The Fair and Accurate Credit Transactions Act ("FACTA") amendment to the FCRA was implemented in 2003 "to prevent identity theft, improve resolution of consumer disputes, improve the accuracy of consumer records, make improvements in the use of, and consumer access to, credit information, and for other purposes." 2004 U.S.C.C.A.N. 1753, H.R. CONF. REP. 108-396, H.R. Conf. Rep. No. 396, 108th Cong., 1ST Sess. 2003, available at 2003 WL 22761472 (Nov. 21, 2003).   15 U.S.C. § 1681c-1, part of FACTA, gives consumers the right to place a 90-day "initial fraud alert" or a seven year "extended fraud alert" on their credit report.   Once a fraud alert or extended fraud alert has been placed, the credit bureaus are required to provide notice of such alert along with any consumer report or credit score generated in using that file. See 15 U.S.C. §§ 1681c-1(a)(1)(A) and 1681(b)(2)(A).   According to one expert, fraud alerts are the "most important new FACTA duties…."  Statement of Chi Chi Wu of the National Consumer Law Center at the House Committee on Financial Services, at 5 (June 19, 2007), available at 2007 WL 1750167.

A prospective user of a consumer report that receives notice of a fraud alert is required to investigate before opening a credit account as requested by the applicant.   15 U.S.C. §§1681c-1(a)(1)(A); 1681(b)(2)(A).   DirecTV did not do this.   It ignored the multiple extended fraud alerts it received from Equifax with regard to Larquette Green's applications for credit, and opened credit in spite of these alerts.   Then, when it had defendant iQor call plaintiff,

iQor's system was broken, such that plaintiff had to call iQor back to alert DirecTV of the fraudulent account.  PUMF 27-28.

### a. DirecTV Received Plaintiff's Extended Fraud Alert.

DirecTV criticizes plaintiff for asserting that she is a victim of identity theft, and argues that it cannot be held liable for any FCRA violation because plaintiff never made a request for an extended fraud alert.  These arguments are unfounded.

#### i. Whether Plaintiff Submitted an Identity Theft Report is Irrelevant to this Case.

The argument that plaintiff has no cause of action under these facts because she did not initiate an extended fraud alert misinterprets the statute.  The plain language of section 1681c-1(h)(2)(B) requires any "prospective user" of a consumer report or credit score that contains an extended fraud alert "to confirm that the application for a new credit plan ...  is not the result of identity theft."  The prospective user's duty is based upon the type of fraud alert it *receives*, not upon the type initiated by the consumer.  It is undisputed in this case that DirecTV received an extended fraud alert from Equifax, PUMF 15-16, and DirecTV therefore had a duty to plaintiff to investigate before accepting the application and opening an account.

DirecTV's argument is a non-sequitur:  there is nothing in the FCRA or anywhere else that automatically converts an extended fraud alert received by a credit report user into an initial fraud alert.  This argument is made of whole cloth, and DirecTV's motion should be denied.

#### ii. Plaintiff Submitted an Identity Theft Report to Equifax.

If the Court finds that a prospective user's duty under section 1681c-1(h), depends upon what sort of fraud alert was initiated by a consumer, rather than what sort of alert the user

receives, it is clear that plaintiff properly requested an extended fraud alert.[1]   There is no

dispute that Larquette Green used plaintiff's social security number in opening the DirecTV

account, see, e.g. UMF 26, and plaintiff is therefore a victim of "identity theft" pursuant to  15

U.S.C. § 1681a(q)(3) and 16 C.F.R. §603.2(b)(1). Plaintiff's identity theft report was a City of

Chicago police report sent to Equifax.  PUMF 9.  This police report constitutes an "identity theft

report" for purposes of the FCRA.  It is a copy of an official, valid report filed with the City of

Chicago Police Department, and the false making of such a report is a violation of 720 ILCS

5/26-1(a)(4), and is a class 4 felony, pursuant to 720 ILCS 5/26-1(b).  This report is specific.  It

identifies several accounts Sears, HSBC, Walmart and "JC Penny" [sic] as the accounts that were

fraudulently opened, and states "In summary: victim related that her social security number

was used to open numerous credit accounts."   PUMF 9.   Equifax apparently did not have a

problem with this police report because it maintained an extended fraud alert on plaintiff's

credit report beginning in October 2008, and continuing at least until DirecTV received notice.

PUMF 7, 8, 9; RUMF 15 (explaining why DirecTV's proffered support for UMF 15 is insufficient

and improper). Whether plaintiff sent an identity theft report to Equifax does not matter, and

in any event, there is no genuine dispute of material fact as to whether plaintiff submitted an

identity theft report to Equifax.  DirecTV's motion for summary judgment should be denied on

this point.

---

[1] The FCRA also *requires* that nationwide consumer reporting agencies such as Equifax accept extended fraud alerts by telephone.  15 U.S.C. § 1681c-1(d).

**b. There is no Requirement in Section 1681c-1 that
a Fraudulent Account be In Plaintiff's "Name" in the Sense Defendants Urge.**

FACTA, section 1681c-1 is designed to protect alleged or possible victims of identity theft (or any other individual) whose extended fraud alerts prospective users like DirecTV receives by placing a prohibition on the opening of credit without first confirming the identity of the applicant.

Thus, the word "consumer" in the ending phrase of 15 U.S.C. §1681c-1(h)(2)(B) that proscribes opening of a credit account "unless the user contacts the *consumer* in person or [calls] to confirm that the application for a new credit plan or increase in credit limit, or request for an additional card is not the result of identity theft" refers to the person who placed the fraud alert. As noted above, section 1681c-1, is designed to stop "identity theft," which is "a fraud committed using the identifying information of another person" including the use of another person's social security number. 15 U.S.C. § 1681a(q)(3); 16 C.F.R. § 603.2(b)(1). This is the only reading consistent with the statutory purpose of FACTA to "prevent identity theft," 2004 U.S.C.C.A.N. 1753.

In other words, the statute imposes a duty upon the user to call the phone number in the fraud alert before establishing a credit account. DirecTV failed to do this, to plaintiff's detriment. PUMF 24-25.

Other readings render the statute ineffective. DirecTV's argument appears to be that a creditor may open fraudulent accounts with impunity, as long as the fraudster uses her own name, and not the name of the person whose identity is being used to open the fraudulent account. This would defeat the identity theft prevention purpose of the statute, particularly when read with to 15 U.S.C. § 1681a(q)(3) and 16 C.F.R. §603.2(b)(1) (definitions of "identity

theft"). A duty to call the credit applicant – which will ALWAYS be the fraudster in cases of actual fraud like this one  -- would not achieve any meaningful result, and would require the user to determine whether the fraud alert number was the phone number of the person whose "name" the application was made. DirecTV's interpretation is simply unworkable. The statute places a duty upon the recipient of an extended fraud alert to call the number provided in the alert before opening any account under anyone's name.

Further support for plaintiff's position is provided by DirecTV's fraud alert call script, which asked plaintiff to press 0 if she did not "authorize a DirecTV account to be opened ***in your name***." PUMF 26. DirecTV's usage of "in your name" in this context provides another likely Congressional intent. Congress intended that "name" be given its ordinary meaning. Merriam-Webster's Collegiate Dictionary eleventh edition (2003) defines "name" as "1a : a word or phrase that constitutes the distinctive designation of a person or thing." Black's Law Dictionary, 8th edition (2004) defines "name" as "n. A word or phrase identifying or designating a person or thing and distinguishing that person or thing from others." A social security number fits the bill as a "name." It is even more distinctive, identifying and distinguishing than a name such as Larquette Green or Brianna Greene. Thus, DirecTV's statement in its call to plaintiff that an account had been opened in her "name" was correct. Although not necessary to a finding of liability, the Court should apply this broad interpretation of "name" in order to effectuate the identity theft purposes of section 1681c-1.

If DirecTV really thought it did not have a duty to call plaintiff, why did it instruct iQor to do so? And if there was no duty to call plaintiff, then there could not have been consent from plaintiff to be called using an autodialer and prerecorded message, as explained below.

In enacting the CCPA, of which the FCRA is a part, Congress intended for courts to broadly construe its provisions in accordance with its remedial purpose. *Brothers v. First Leasing*, 724 F.2d 789, 793 (9th Cir.1984). Courts should construe consumer protection statutes "liberally [ ] in favor of" consumers. *Bizier v. Globe Fin. Serv., Inc.*, 654 F.2d 1, 3 (1st Cir.1981), cited in *Parker v. 1-800 Bar None, a Financial Corp., Inc.,* 2002 WL 215530 (N.D.Ill. Feb. 12, 2002).

The section of the FCRA that provides a private right of action, 1681n,  creates a right of action for "any consumer" who has been adversely affected through violation of "any requirement imposed under this subchapter."  Cf. *Perry v. First Nat. Bank*, 459 F.3d 816 7th Cir. 2006) (no private right of action pursuant to section 1681m, but only because that subsection specifically repealed such).

Courts have therefore been liberal in finding standing to sue where a consumer has been adversely affected by the breach of a duty under the FCRA.  For example, one court found that a consumer has standing to sue even where the report at issue is on the consumer's spouse, not the consumer, and contains no information about the consumer, provided that the information in the file adversely affects the consumer. *Conley v. TRW Credit Data*, 381 F.Supp 473 (N.D.Ill. 1974) (purpose of the FCRA would be "circumvented by disallowing the wife, as to whom vital information is furnished in a credit report, to challenge the impartiality and fairness of reporting procedures."); *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 46-47 (D.C.Cir. 1984). Similarly, another court found that a wife may sue pursuant to the FCRA where information in the husband's consumer report impaired her ability to obtain financing on jointly owned

property.  *Williams v. Equifax Credit Info. Servs.*, 892 F.Supp. 951, 954-55 (E.D. Mich. 1995).[2]

Here, plaintiff is a victim of identity theft as defined by the FCRA, and the section under which

she sues instructs users of credit reports that have formal, statutory, indicia of fraud, to call a

telephone number to verify that there was no identity theft before opening an account.

DirecTV did not do this, despite multiple warnings through Equifax, allowed an account to be

opened using plaintiff's social security number and then used a broken prerecorded message

system to try to notify plaintiff of the fraud nearly a week later.  DirecTV's motion should be

denied.

### IV.    Defendants Violated the TCPA.

In passing the TCPA, Congress acted to "protect the privacy interests of residential

telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the

home and to facilitate interstate commerce by restricting certain uses of facsimile machines

and automatic dialers." S.Rep. No. 102-178, at 1 (1991) as reprinted in 1991 U.S.C.C.A.N. 1968;

see *Satterfield v. Simon & Schuster*, 569 F.3d 946, 954 (9th Cir. 2009).  As the Ninth Circuit

explained in *Satterfield*:

> The TCPA was enacted in response to an increasing number of consumer complaints
> arising from the increased number of telemarketing calls. The consumers complained
> that such calls are a "nuisance and an invasion of privacy." The purpose and history of
> the TCPA indicate that Congress was trying to prohibit the use of ATDSs to communicate
> with others by telephone in a manner that would be an invasion of privacy. We hold

---

[2] See also *Haque v. CompUSA*, 2003 WL 117986, at *2 (D.Mass. Jan 13, 2003) (plaintiff who was damaged as a result of an error in a friend's credit report has standing to sue); *Soghomonian v. U.S.*, 278 F.Supp. 2d 1151 (E.D.Cal. 2003), order and jury verdict of $964,000.00 against Trans Union vacated as condition of confidential settlement on appeal, 2005 WL 1972594 (Jun. 20, 2005)(wife has standing to sue for damages arising out of husband's consumer report because it had wife's information on it); *Oppenheimer v. Guzco Guarantee*, 977 F.Supp. 549 (D.P.R. 1997) (wife whose check was rejected as a result of husband's credit report has standing to sue).

that a voice message or a text message are not distinguishable in terms of being an invasion of privacy. *Satterfield*, 569 F.3d at 954 (citations omitted).

Apparently admitting that iQor used an automatic telephone dialing system and prerecorded voice to call plaintiff, see PUMF 25, both defendants' summary judgment motion as to the TCPA claims focus on the "prior express consent" affirmative defense. Defendants argue that in providing her cellular phone number to Equifax, plaintiff consented to receive autodialed and prerecorded calls from DirecTV. Defendants are wrong for at least three reasons.

First, although the Federal Communication Commission (FCC) has carved out a limited exception to the normally rigorous "prior express consent" statutory language analysis, that exception is inapplicable here.

Second, as explained above, any consent to receive autodialed or prerecorded messages had expired by the time defendants made the call in question, because the call was noncompliant with the FCRA.

Finally, and alternatively, both defendants argue for varying reasons that DirecTV had no duty to call plaintiff in sections B.1 and B.2. If the Court adopts either of these arguments, then DirecTV had no privilege or consent to call plaintiff's cell phone using an autodialer or prerecorded message, either.

### a. The 2008 FCC Order Does Not Broaden "Prior Express Consent" in this Circumstance.

**T**he general rule is that no person may use an autodialer or a prerecorded message in a call to a cellular telephone. 47 U.S.C. §227(b)(1)(a)(iii); 47 C.F.R. § 64.1200(a)(1)(iii). "Prior express consent" is an affirmative defense for which the caller has the burden of proof. *In re Rules and Regulations Implementing the TCPA*, FCC 07-232, 23 FCC Rec. 559, at ¶10 (Jan. 4, 2008) ("2008 Order"); *Hicks v. Client Services, Inc.*, 2009 WL 2365637 (S.D.Fla. June 9, 2009);

13

*New Jersey v. New York*, 523 U.S. 767, 786-87 (1998)(burden of proof, generally, for affirmative defenses in civil cases is preponderance of evidence); *Sengenberger v. CCS, Inc.*, 2010 WL 1791270 (N.D.Ill. May 5, 2010) (Zagel, J., entering summary judgment for plaintiff).[3]

   There is a nearly nineteen year history of FCC rulemaking regarding the TCPA, which proscribes so called "junk faxes" as well as junk text messages and autodialed/prerecorded calls.  The FCC issued regulations and/or orders in 1992, 1995, 2003 and 2008, sometimes taking different positions as to certain issues, with the Law of the Land changing accordingly. To the extent that they apply, these FCC regulations and orders are not reviewable by this Court.  *CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 450 (7th Cir. 2010).

   Because the challenged calls in this case happened in January 2010, it is the Law of the Land in January 2008 that matters in this case.  On January 4, 2008, the FCC made clear that there was only a very narrow exemption for calls where there is an ongoing relationship between the caller and the called party.  The FCC,

> emphasize[d] that prior express consent is deemed to be granted <u>only</u> if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed. 2008 FCC Order at ¶10 (emphasis added).

This narrow exception is plainly contrary to the plain text of the statute and regulation, which both require that any consent to receive such calls be "express."  See argument, *infra*, *Leckler v. CashCall*, 554 F.Supp.2d 1025, 1029 (S.D.Cal. 2008) ("Leckler I"), vacated upon reconsideration based upon inapplicable grounds, 2008 WL 5000528 (Nov. 21, 2008) ("Leckler II"). But this Court does not have jurisdiction to review FCC Final Orders.  *CE Design*, 606 F.3d at 450.  Although

---

[3] Because the TCPA is a remedial statute, *Italia Foods, Inc. v. Sun Tours, Inc.*, -- N.E.2d --, 2010 WL 686395 (2d Dist. Feb. 25, 2010), the party seeking sanctuary in a statutory exception bears the burden to prove that it is entitled to such.  See., e.g. *FTC v. Morton Salt Co*., 334 U.S. 37, 44-45 (1948).

DirecTV is a "creditor" for purposes of the FCRA, *Murray v. New Cingular Wireless*, 523 F.3d 719, 722 (7th Cir. 2008), there was no preexisting relationship between plaintiff and either defendant, such that the cell phone number was "provided during the transaction that resulted in the debt owed."

This order is inapplicable to the facts at hand, the Court must do an analysis of the statutory and regulatory language itself to determine what "prior express consent" means under these circumstances. The phrase "prior express consent" is a term of art. All other courts to consider the meaning of "prior express consent" in this context have held that the consenting party must knowingly and intentionally consent *to receive autodialed and prerecorded messages*.

In *Leckler v. CashCall*, Tricia Leckler, a consumer, sued Cashcall, a lender, under the TCPA section 227(b) for calling her on her cell phone using an autodialer and prerecorded voice message. *Leckler v. CashCall*, 554 F.Supp.2d 1025, 1029 (S.D.Cal. 2008) ("Leckler I"), vacated upon reconsideration based upon inapplicable grounds, 2008 WL 5000528 (Nov. 21, 2008) ("Leckler II"). Cashcall moved for summary judgment, arguing that Leckler gave her "prior express consent" to receive autodialed and prerecorded calls on his cell phone by placing her cell phone number on her Cashcall loan application.

The Court in *Leckler I* found that there exists a crucial difference in the plain meaning of "prior express consent" when compared with "implied consent" within the context of the TCPA. "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Black's Law Dictionary defines "express consent" as:

> Express consent.  That directly given, either viva voce or in writing.  It is positive, direct, unequivocal consent, requiring no inference or implication to supply its meaning.  Pacific Na. Agricultural Credit Corporation v. Hagerman, 40 N.M. 116, 55 P.2d 667, 670.

Black's Law Dictionary (6th Ed. 1991) (emphasis added).  Implied consent, however, is something different, where an inference must be made:

> Implied consent.  That manifested by signs, actions, or facts, or by inaction or silence, which raise a presumption of inference that the consent has been given.  An inference arising from a course of conduct or relationship between the parties, in which there is mutual acquiescence or a lack of objection under circumstances signifying assent.  Allstate Ins. Co. v. State Farm Mutual Automobile Ins. Co. 260 S.C. 350, 195 S.E.2d 711, 713 (use of motor vehicle).
>
> For example, when a corporation does business in a state it impliedly consents to be subject to the jurisdiction of that state's courts in the event of tortious conduct, even though it is not incorporated in that state.
>
> Most every state has a statute implying the consent of one who drives upon its highways to submit to some type of scientific test or tests measuring the alcoholic content of the driver's blood.  In addition to implying consent, these statutes usually provide that if the result of the test shows that the alcohol content exceeds a specified percentage, then a rebuttable presumption of intoxication arises.

*Id*.  Neither autodialers nor prerecorded messages were contemplated when plaintiff placed her fraud alert.  Any consent to use such devices would have to have been "implied," rather than "express."

Leckler I also collected cases that interpreted TCPA language as to consent to receive "junk faxes," all of which define "express consent" consistent with plaintiff's reading. *Weitzner v. Iridex Corp.*, 2006 WL 1851441, at *3-4 (E.D.N.Y. June 29, 2006) (also collecting cases); 47 U.S.C. § 227(a)(4) (2004); *Chair King, Inc. v. GTE Mobilnet of Houston, Inc.*, 135 S.W.3d 365 (Tex.App.2004), overruled on other grounds, 184 S.W.3d 707 (Tex.2006). These cases and Black's definition are consistent definitions in dictionaries of common usage.  For example, Meriam-Webster's Collegiate Dictionary defines "express" as

[1]**ex-press ... 1 a : directly, firmly, and explicitly stated <my ~ orders> b : EXACT, PRECISE...**

And the Concise Oxford English Dictionary's definition of "express" is:

**express [3] adj. stated explicitly. > specific, particular.**

Concise Oxford English Dictionary (11th ed. 2008)**.**  This makes sense.  Congress' intent in passing the TCPA was to curb the use of frustrating autodialed and prerecorded calls to cell phones.  *Joffe v. Acacia Mortg. Corp.*, 211 Ariz. 325, 328 (Ariz. Ct. App. 2005).  One reason the calls are so annoying is that there is no person on the other end with whom to speak, like what happened here: no person was on the other end of the call to discuss the fraud alert.  Unless the proposed recipient was given a choice as to whether she wanted to receive autodialed and prerecorded message calls, and made it "expressly" clear that she did not mind being called in such a way, the calls are prohibited.

Citing Black's Law Dictionary, the Ninth Circuit in *Satterfield v. Simon & Schuster*, 569 F.3d 946, 954 (9th Cir. 2009), a text-message-to-cell-phone TCPA case based upon the same section as this case similarly held that "prior express consent" must be "clearly and unmistakably stated."  *Id.* at 955.  The Satterfield decision illustrates the hypertechnicality of the TCPA and the narrowness of the prior express consent defense, although in a different context.

There never was a question as to whether the *Satterfield* plaintiff provided prior express consent to receive text messages from Nextones, the company to which he provided his cell phone number; the plaintiff conceded this point. *Satterfield v. Simon & Schuster*, 2007 WL 1839807, at *6  (N.D.Cal. Jun. 26, 2007).  On appeal, the issue was whether the plaintiff's admitted prior express consent to Nextone transferred to Simon & Schuster.  The Ninth Circuit

reversed the District Court, holding that there was no express consent to receive text messages from Simon & Schuster because it was neither an "affiliate" nor a "brand" of Nextones. *Id.* at 955.

Unlike *Satterfield*, there were never any autodialed or prerecorded messages contemplated by plaintiff when she submitted her cell phone number to Equifax. Certainly there is no contract between plaintiff and Equifax, or between plaintiff and DirecTV that mentions autodialers or prerecorded messages.

Indeed, nothing about providing one's phone number to a credit bureau regarding an extended fraud alert has anything to do with autodialed or prerecorded calls. There simply is no evidence that plaintiff directly, firmly, particularly, explicitly, specifically or particularly consented to receive autodialed or prerecorded calls. A person cannot explicitly consent to receive autodialed or prerecorded calls, without mentioning or contemplating the mechanism. As *Leckler I* found,

> If the exemption were to apply whenever a called party gave prior consent to be called in general, without any consideration given to the method or type of call, the exemption would be contrary to the logic of the statute, which targets only those calls made using an autodialer or an artificial or prerecorded voice.

The *Lecker I* reasoning is correct. Congress could have required mere "consent," but it did not. Its choice to require "prior express consent" means that Congress intended that a consumer provide unequivocal, "express" consent to receive calls on her cell phone from otherwise proscribed equipment.

Upon reconsideration, *Leckler II* concluded that because the 2008 FCC Order directly applied to its facts, in light of the Hobbs Act, 28 U.S.C. § 2342, and consistent with the later-

decided Seventh Circuit *CE Design* opinion, it lacked jurisdiction to do a *Chevron* analysis of the 2008 FCC Order and vacated *Leckler I.*

The only other court to have considered "prior express consent" outside the context of the FCC Orders[4] was *Edeh v. Midland Credit Management, Inc.*, 2010 U.S. Dist. LEXIS 103888, at * 15-18 (D. Minn. Sept. 29, 2010). The debt collector defendant in *Edeh* provided no evidence of prior express consent, *Id.* at *2-3, instead arguing that there was implied consent, and that it "reasonably relied upon the seller of the debt to provide the appropriate contact information." *Id.* at 16. Even more interesting, the defendant debt collector in *Edeh* argued that the plaintiff was "deemed to have consented to receiving calls on his cell phone regarding that debt" if plaintiff provided his telephone number to credit bureaus. Defendant's Memorandum of Law In support of Motion for Summary Judgment, *Edeh v. Midland Credit Management, Inc.*, 0:09-cv-01706-PJS-FLN, Docket item 45 at pg. 11.

These arguments, the Court found, were beside the point:

Midland's call to Edeh's cellular phone was permissible only if it was made "with [Edeh's] prior express consent." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). "Express" means "explicit," not, as Midland seems to think, "implicit." Midland was not permitted to make an automated call to Edeh's cellular phone unless Edeh had previously said to Midland (or at least to Midland's predecessor in interest) something like this: "I give you permission to use an automatic telephone dialing system to call my cellular phone." Midland has no evidence that Edeh gave such express consent.

*Edeh* was correct in analyzing the case under the bare language of the statute because the 2008 FCC Order did not apply: there was no competent evidence that Mr. Edeh provided his phone number to any party. *Id.*

---

[4] The cases cited by DirecTV are inapplicable. The plaintiff in *Starkey v. Firstsource,* 2010 WL 2541756 (W.D.N.Y. Mar. 10, 2010) provided his cell number to the original creditor, and the plaintiffs in *Pugliese v. Prof. Recovery Serv., Inc.*, 2010 WL 2632562 (E.D.Mich. June 29, 2010 ) provided their cell numbers directly to the debt collector defendant. Both of those cases fall squarely within the 2008 FCC Order. This one does not.

**b. Even if Providing her Cell Phone Number to DirecTV constituted "Prior Express Consent," to receive Autodialed and Prerecorded Message calls, any consent expired when DirecTV opened an account associated with plaintiff.**

As explained above, the autodialed call to plaintiff's cell phone was made in *violation* of, not pursuant to 15 U.S.C. §1681c-1(h)(1)-(2).  Those subsections require a potential creditor to call the potential victim *in advance* of opening the account in order to prevent situations like this from happening.  In this case, DirecTV opened the account on December 28, 2009, and made the autodialed and prerecorded phone call three days later on January 5, 2010.

Thus, even if providing one's cell phone number to a credit reporting agency in association with a fraud alert or extended fraud alert constitutes "prior express consent" to receive robocalls from DirecTV pursuant to section 1681c-1(h), such consent would not continue to  exist after the creditor had already opened the fraudulent or mistaken account.

Indeed, not even creditors who are provided safe harbor by the 208 FCC Order's exemption for numbers provided directly to the creditor cannot permissibly call consumers for purposes other than those associated with the account the number was provided.  *Id*. at fn 38.

In order to comply with both federal laws, DirecTV should have called plaintiff using a live operator who manually dialed the phone number *before* it opened the questionable account.  Recall that not only did the credit report have an extended fraud alert on it, it also contained much of plaintiff's personal information, including plaintiff's address, social security number and phone number, rather than the applicant's.

The TCPA and FCRA are complimentary, rather than contradictory.  The FCRA 1681c-1(h) requires that creditors call extended fraud alert numbers before opening an account, and the TCPA section 227(b) prohibits prerecorded calls and calls made with an autodialer.  Even if the laws were conflicting, which they are not, the Seventh Circuit has held that where there are two

conflicting federal statutes, companies must comply with both. *Randolph v. IMBS, Inc.*, 368 F.3d 726, 732 (7th Cir. 2004) (corporate defendant was charged with compliance with both the FDCPA and the IRS code, even though the two laws were "not entirely congruent.")

And, of course, if the fraud alert applicant is a legitimate customer of DirecTV and there is no identify theft involved, that person probably would have already given DirecTV her phone number, and the 2008 FCC Order would likely insulate DirecTV from liability. Indeed, such a cross-check might be part of a "reasonable procedure" to prevent fraud pursuant to 15 U.S.C. §1681c-1(h). But that is not what happened here: had DirecTV "cross checked" the phone numbers provided by Larquette with the fraud alert number it received, it would have realized that something was amiss. PUMF 15.

All plaintiff asks is for DirecTV to comply with two complimentary federal statutes. The FCRA places a duty upon a user of credit reports to provide an appropriate level of diligence to credit reports with fraud alerts, and the TCPA prohibits companies from using an autodialer or prerecorded message in fulfilling such duty. Persons like plaintiff who have placed a fraud alert on their credit reports deserve better and more direct, inquiry into potential fraud than automated telephone calls.

### c. Alternatively, if DirecTV had no Duty to Call Plaintiff, then there was no Privilege to call plaintiff, either.

Finally, both defendants argue vehemently that DirecTV had no FCRA duty to call plaintiff. If this is true, then it would necessarily follow that defendants had no privilege to call plaintiff, either. Defendants cannot have it both ways: maintain that they had a right to call plaintiff because she placed a fraud alert on her credit report, but no duty to do so. This

slippery argument by defendants misses the point, though: DirecTV violated both statutes, and summary judgment should be denied.

### **CONCLUSION**

For the forgoing reasons, Defendants' motions for summary judgment should be denied.

Respectfully submitted,

/s/Alexander H. Burke

**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com